## SILENT GLOW OIL BURNER CORPORATION v. CROOKES.

### No. 2212.

District Court, D. Connecticut.
April 12, 1934.

Thomas B. Booth, of Boston, Mass., for plaintiff.

Arthur C. Eckert, of St. Louis, Mo., for defendant.

THOMAS, District Judge.

This is a suit brought by the plaintiff to restrain an alleged infringement of two patents, No. 1,782,730 and No. 1,851,919. The bill as originally filed also charged infringement of patent No. 1,377,669, but before the trial plaintiff moved that its bill of complaint as to the last-mentioned patent be dismissed without prejudice and with costs to be taxed against the plaintiff, and the motion was granted.

Patent No. 1,782,730 was issued on November 25, 1930, to the plaintiff as assignee of Albert A. Lapointe for improvements in oil burners, on an application filed April 20, 1925. The other patent in suit, No. 1,851,-919, was issued March 29, 1932, to the plaintiff as assignee of Frederick F. Neumann for improvements in liquid fuel burners, on an application filed April 24, 1931.

The corporate existence of plaintiff and its title to the patents in suit is admitted by the defendant.

Infringement is charged of claims 6, 7 and 8 of the Lapointe patent, and of claim 10 of the Neumann patent.

The bill charges the defendant with infringement as to certain oil burners sold by him which were manufactured by International Oil Heating Company of St. Louis, Mo., which company controlled and conducted the defense in this case. So far as appears in this record, the nominal defendant, Thomas A. Crookes, never did anything more than sell the oil burner, Plaintiff's Exhibit 8, including two annular sheet metal plates marked Plaintiff's Exhibit 8–A. The jurisdiction of this court is therefore invoked because of the facts just set forth, which show that the International Oil Heating Company of St. Louis, Mo., is the real defendant and Thomas A. Crookes is the nominal defendant selling the product of the real defendant. The bill of complaint seeks an injunction, accounting, and damages.

The inventions described in the two patents in suit relate to oil burners, and more particularly to those generally known as blue-flame combustion-tube burners. A burner of the type mentioned usually comprises a base, on which are mounted perforated, spaced combustion tubes or shells, preferably concentrically arranged one within another,

thus forming between them an annular combustion chamber, to which liquid hydrocarbon vapor is supplied commingling with air entering through the perforated walls of the tubes or shells. The mixture burns with a blue flame characteristic of vapor or gas when complete combustion occurs. The liquid hydrocarbon, such as oil, is fed into passages, such as grooves in the base below the combustion chamber. Inasmuch as the liquid hydrocarbon cannot be ignited, it must first be either vaporized or finely divided and burned in the presence of air. To start the burner, the oil in the base must initially be vaporized by some method, such as preheating. The burner may be primed with an easily ignitible volatile fuel, but the common method is to use a wick positioned near the bottom of the combustion chamber and adapted to be saturated with the liquid hydrocarbon in the base. When the wick is lit the burner heats up, and, as the temperature of the latter rises, heat is transmitted to the base, where, in the course of time, some of the free liquid hydrocarbon begins to vaporize, adding to the combustion and the heating effect. This gradually builds up the combustion and the temperature of the base, thus bringing the burner to full fire condition and to a point where the liquid hydrocarbon, independently of the wick or other preheating means employed, is vaporized in the base, so that the burner then becomes self-vaporizing. The vapor rises into the combustion chamber commingling with the air therein, and the mixture burns with a blue flame, and the products of combustion leave the burner at the annular top of the combustion chamber.

Oil burners of the general type referred to were known for many years prior to the applications which resulted in the patents in suit and were applicable for use in cooking ranges, heating stoves, and furnaces, but they all had, as appears from the evidence adduced by the plaintiff, more or less serious inherent defects prior to Lapointe's and Neumann's entry into the field. These defects will be referred to infra.

In 1924 the plaintiff was engaged in developing the blue-flame combustion-tube burner for use in cooking ranges and heating stoves. These burners are known in the trade as range burners. They are designed to be installed in the fire box of a kitchen range or heating stove, after the removal of the grate bars, and are used in substitution for the coal or wood fire which would otherwise be employed to heat the oven, lids, top, and walls of the stove. In 1924 no commercial use had been attempted of this type of burner as a range burner. Plaintiff was a pioneer in that field, and had no noticeable competition therein until 1927 or 1928.

### The Lapointe Patent.

Lapointe's patent discloses a blue-flame combustion-tube burner "that may be readily lighted and also that may be readily cleaned when occasion requires." Lines 9 and 10, page 1 of the specifications. The structure described in this patent includes a base provided with a plurality of concentrically arranged annular fuel grooves or troughs. On the edges of these grooves are removably supported spaced vertically extending perforated combustion tubes or shells which form between them combustion chambers, in which vaporized fuel is adapted to be burned. The outermost groove communicates with an upright supply pipe connected to the base member. A cup is removably threaded to the bottom of the supply pipe and closes the lower end thereof. A lateral fuel supply branch pipe is connected to said upright pipe above said cup. The upright fuel supply pipe is also connected with the remaining grooves in the base.

The arrangement of the fuel supply system in relation to the vaporizing chamber is claimed by plaintiff to be the new element of the combination defined by the claims in suit, which obviates at least two of the serious difficulties encountered with oil burners prior to Lapointe's invention.

From the testimony presented on behalf of the plaintiff, it appears that in the operation of the burner the liquid fuel is vaporized in the fuel groove, and thus carbonized fuel accumulates through long usage. This carbon tends to form a hard coating or crust in the vaporizing groove in the base, as well as in the fuel supply opening leading to the groove and, to some extent, within the fuel supply pipe. This carbon deposit must be removed from time to time, as otherwise it interferes with the proper operation of the burner.

Lapointe arranged his fuel supply pipe in relation to the vaporizing groove in the bottom of the burner so as to permit easy cleaning of the burner and removal of the carbon deposits therein without dismantling the fuel supply system. The carbon deposit is removed by first lifting the combustion chamber from the base and then using a scraping tool which is run through the groove a sufficient number of times to loosen the carbon from the walls of the groove. Prior

to Lapointe's invention, the loosened particles of carbon had to be carefully lifted from the groove to avoid their falling into the open oil supply port. The thickest and hardest crust tends to form on or about the oil supply port. With the utmost care in this cleaning operation substantial amounts of carbon could not be kept from dropping into the oil supply port, and thence into the supply pipe. The carbon could be removed only by dismantling the fuel supply system. With the development of Lapointe's invention, the cleaning operation became quicker and easier because carbon particles passing through the fuel supply port fall to the bottom of the supply pipe, from which they can be removed by detaching the cup. The supply pipe can be easily cleaned by a cleaning rod which is furnished with each commercial burner that the plaintiff and also the International Oil Heating Company make.

There was another serious difficulty with the oil burner of the type herein described and made prior to Lapointe's invention. Water in the liquid hydrocarbon caused an irregular and variable action in combustion. The fuel supply system, as discussed in Lapointe's patent, remedied this defect so that the water in the liquid hydrocarbon settles in the lower portion of the supply pipe before it reaches the combustion chamber and can easily be removed without dismantling the burner and the feed lines. The water accumulating in the trap is removed just as carbon particles are removed, so that all trouble, prior to Lapointe, with both water and carbon are now avoided by the use of what is called, in the trade, the "carbon leg."

The claims in suit herein read as follows:

"6. A burner of the class described having a base member provided with an open fuel groove therein, spaced, perforated, tubular wall members removably supported on said base member presenting between them a combustion chamber above the fuel groove, in which chamber the vaporized fuel is adapted to be burned, a fuel supply opening in the bottom of the groove, an upright supply pipe connected to the base member and said opening and in line with the latter, a cup constituting a trap removably threaded to the bottom of said pipe and closing the bottom thereof, and a lateral fuel supply branch pipe connected to said upright pipe above said cup, whereby said pipe may be opened at its lower closed end and cleaned either through said trough end or lower end.

"7. A burner of the class described having a base member with an open fuel groove therein, spaced, perforated, tubular wall members removably supported on said base member presenting between them a combustion chamber above said fuel groove, in which chamber the vaporized fuel is adapted to be burned, a fuel supply opening in the bottom of the groove, an upright supply pipe connected to the base member and said opening and in line with the latter, a removable closure for the bottom of said pipe, and a lateral fuel supply branch pipe connected to said upright pipe above said closure to provide a trap at the bottom thereof, whereby said pipe may be opened at its closed end to be cleaned either through the trough connected end or the bottom end thereof.

"8. A burner of the class described having a base member provided with an open fuel groove therein, spaced, tubular wall members removably supported on said base member presenting between them a combustion chamber above said fuel groove in which the vaporized fuel is adapted to be burned, a fuel supply opening in the bottom of the groove, a supply pipe connected to the base member and said opening and in line with the latter, a removable closure for the opposite end of said pipe, and a lateral branch pipe connected to said supply pipe intermediate its ends, whereby said supply pipe may be opened and, together with said fuel supply opening, cleaned through the trough end of the pipe or opposite end thereof."

It will be noted that in each of these claims the cup or removable closure in the bottom of the upright supply pipe is claimed in combination with the fuel groove and the combustion chambers above the latter. This seems to be necessary in order to bring out the relationship between the fuel supply pipe, fuel supply port, and the combustion chamber. Therefore these claims are, in my opinion, true "combination claims," as this term is defined in the many decisions relating to this subject.

The defenses relied on are: (A) Invalidity of the claims in view of the prior art and the state of the art; (B) dedication of the claims to the public; (C) the claims form aggregations as distinguished from patentable combinations; (D) noninfringement.

(A) *Prior Art.* The defendant has pleaded in his answer an unduly and unnecessarily large number of alleged prior art patents against the simple structure defined by the three claims in suit, and has in his brief referred to all of these patents. These facts by themselves seem to indicate a lack of confidence in the anticipating character

of the same. I cannot understand why, to meet a simple issue, it is necessary to rely on sixteen patents without pointing out which of the same is to be considered the nearest approach to the problem.

■ It is unnecessary to discuss the disclosure of the Sherman patent No. 1,676,223, Defendant's Exhibit XX, the Newbery patent No. 1,780,273, Defendant's Exhibit YY, and the Keenan patent No. 1,732,605, Defendant's Exhibit JJJ, as each one was granted on an application having a filing date which is later than that of the application which resulted in the Lapointe patent in suit. The date of Lapointe's invention on the face of his patent, and without the necessity of further proof, was at least as early as April 20, 1925, which is the filing date of his application. On this point ·the law is well settled. Anticipation being an affirmative defense, defendant can prevail only in case undisputed testimony carries the date of the invention of the reference patent relied on to a date earlier than either the date of the application of the patent in suit or any earlier invention date proven by the patentee. Defendant having failed to offer any testimony to overcome the application date of the patent in suit, it follows that the Sherman, Newbery, and ·Keenan patents above referred to are ineffective for the purpose relied upon by the defendant.

■ In dealing with the remaining patents relied upon by the defendant, it should be borne in mind that the claims in suit are not directed to the fuel supply system per se, but to a combination of elements. These claims each call for a combustion chamber, a pair of removable overhead combustion tubes, an open fuel groove below the combustion chamber, an upright pipe in line with the open oil inlet in the bottom of the groove which pipe has a removable closure, and a laterally projecting branch pipe above the closure. As pointed out above, not only is water which may be in the oil prevented from reaching the groove, but the latter can be readily cleaned of carbon without the removal of the burner from the range in which it is installed or taking the burner apart, thus permitting the burner to perform its function as a blue-flame combustion type burner, unaffected by either carbon or water. Even if it were found that a trap feature of the fuel line is old and known per se, its relationship to the remaining elements of the burner may be novel and patentable if a new, useful, and beneficial result, never attained before, is produced. I have patiently and carefully perused all of the patents relied on by the defendant, with the exception of the three patents above referred to as not constituting prior art, and conclude that the combination called for by claims 6, 7, and 8 of the Lapointe patent in suit is novel and not shown by the prior art patents, taken either singly or combined; that the combination produces a new and beneficial result never attained before; and that, consequently, these claims are valid. It would serve no useful purpose to analyze these patents, but it is sufficient to say that the inventions disclosed therein do not solve Lapointe's problem, and that the patents do not, even in a remote way, describe the same.

■ (B) *Dedication of the Claims in Suit to the Public.* The defendant contends that, inasmuch as original claims 5 and 6, which refer to the supply pipe system only, were canceled in the application of Lapointe which resulted in the patent in suit, the claims now in suit are void by reason of the fact that the structures of original claims 5 and 6 were dedicated to the public.

A mere reading of the file wrapper and contents of the patent in suit convinces me that the claims in suit are limited in scope compared with canceled original claims 5 and 6; that the usual procedure was followed in this case in the Patent Office; and that nothing was done contrary to the rules of practice of the Patent Office or to the laws pertaining to patents on inventions. The applicant Lapointe had the right to amend, and did amend, his application in reply to the Patent Office Examiner's citation of references and reasons for rejection. While Lapointe may have dedicated to the public the structures defined by original claims 5 and 6, I am constrained to hold that he did not dedicate the invention called for in the claims in suit.

■ (C) *Aggregation Claims.* This defense has been dealt with hereinabove. It is without merit because the claims contain only such elements as are necessary to properly define the invention sought to be protected thereby.

· (D) *Noninfringement.* Infringement is not seriously contested by the defendant. I find that Plaintiff's Exhibit 8, which is defendant's burner, has in its fuel supply pipe a removable pipe plug that is disposed below the lateral branch pipe, so that a trap is formed and operated for the purpose described and set forth in the claims in suit, the supply pipe being adapted to be opened

. at its closed end to be cleaned either through the vaporizing groove in the burner base or through the opposite end of the pipe. It follows, therefore, that Plaintiff's Exhibit 8, defendant's burner, infringes claims 6, 7, and 8 of the Lapointe patent in suit.

### The Neumann Patent.

■■■ In the development of plaintiff's burner, model W, (Plaintiff's Exhibit No. 11) was the next step following its model R.

Inasmuch as Neumann's invention was a further development of plaintiff's model W, it seems to be advisable first to describe its construction.

Model W comprises a cast-iron base having upstanding walls forming spaced inner and outer annular fuel grooves which are connected by radial cross-ducts. On the base are mounted four spaced concentrically arranged combustion tubes, forming inner and outer combustion chambers. Each chamber communicates with one of the fuel grooves. Within the inner combustion tube there is formed an inner air chamber, closed at the top by a top plate and receiving air through a central opening in the base. Between the combustion chambers there is also formed an intermediate air chamber closed at the top by a ring and receiving air through the opening in the base between the inner and outer fuel grooves. The inner fuel groove is relatively broad, and its inner part is covered by a removable cast-iron cover plate, Plaintiff's Exhibit 11–A. This cover plate fits over the inner upstanding wall of the groove, extends outwardly to partially cover the latter, and, at its outer edge, provides a shoulder supporting the inner combustion tube. Liquid hydrocarbon is supplied to an open port in the bottom in the covered part of the relatively broad fuel groove below the cast-iron cover plate. During the starting of the burner liquid fuel passes from said port into the outer uncovered part in the fuel groove and through the cross-ducts to the outer fuel groove in order to saturate wicks which are fitted into each groove beneath the overlying combustion chamber.

The patentee Neumann discarded the thick cast-iron cover plate and made use of a thin sheet metal vaporizing cover plate, a specimen of which is in evidence as Plaintiff's Exhibit 15. Several advantages are claimed by the substitution of thin metal cover plate for a thick cast-iron plate, and the whole controversy seems to turn around this point.

It is claimed by plaintiff that Neumann, by substituting one plate for another, ob-

tained results which were wholly unexpected and unobvious, and thereby removed his invention from the general rule, which is that a mere substitution of material does not amount to invention.

The single claim in suit reads as follows: "10. A burner having a pair of concentric, spaced, annular, combustion tubes forming between them a combustion chamber and having an inner air chamber enclosed by the inner combustion tube, a base having upstanding walls presenting between them a broad, annular fuel chamber, a removable thin sheet-metal, heat-conducting cover plate covering the inner part of said fuel chamber and underlying the inner air chamber and providing a fuel vaporizing space thereunder but leaving an uncovered opening adjacent the outer wall of the fuel chamber registering with the overhead combustion chamber, and means for delivering liquid fuel to the fuel chamber."

The general combination of this claim was old and well known prior to Neumann's invention. Neumann substituted for the removable cast-iron plate, covering the inner part of the fuel chamber, a thin sheet metal heat-conducting cover plate, which is constructed in plaintiff's burner of a specific material not defined in the claim in suit.

The defenses relied on are: (E) That the subject-matter of claim 10 was invented by one Otto Buder, and the Buder burner sold and in public use for more than two years prior to Neumann's application date; (F) invalidity of the claim in view of the prior art and the state of the art; (G) dedication of the claim to the public; (H) noninfringement.

(E) *The Buder Burner.* Depositions were taken on behalf of the defendant, and it is contended by defendant that these depositions and the exhibits offered therein prove that Buder conceived the invention defined by claim 10 of the Neumann patent on August 2, 1928; that Buder completed the invention by the construction and operation of a burner, Defendant's Exhibit 2, on October 5, 1928, and that a similar burner, Defendant's Exhibit 5, was sold and went into use in January, 1929, which is more than two years prior to Neumann's application date.

It seems to be unnecessary to consider whether or not the proofs establish defendant's contention as to the above dates of construction, operation, sale, and use of the Buder burner because these exhibits embody cast-iron plates covering the inner part of the wide fuel chamber supporting the inner combustion tubes. They do not employ the

thin sheet metal plate of the Neumann patent. As a matter of fact, it appears from Buder's testimony that the International Oil Heating Company did not adopt the sheet metal plate in place of the cast-iron plate until the latter part of the summer of 1931. Depositions p. 59, XQs 413, 414. Consequently, this defense must fall.

(F) *The Prior Art.* Defendant has set up such a number of alleged prior art patents in his answer to meet the simple issue above defined that the remarks made in connection with Lapointe's patent in suit on this point are emphasized and reiterated here.

The Sherman patent, No. 1,848,207, is not part of the prior art, because it appears from the testimony of Sherman that he is not the inventor of the sheet metal vaporizing plate. On the contrary, he disclaimed it, testifying that the thin sheet metal plate was the invention of Neumann alone.

It appears from the testimony offered that the plaintiff's first model W was an improvement over its model R. It was adopted only for use with good grades of oil, and its sale was limited to the territory east of the Hudson river, where uniformly good grades of oil were obtainable at that time. Furthermore, its heating capacity was inadequate to meet the requirements of a broad field, and its starting or heating up time precluded its use in areas accustomed to wood as fuel, and prevented any interest on the part of those using gas. Neumann, by constructing the cover plate of thin sheet metal, not only increased the heat capacity of the burner and reduced carbonization, but lessened the starting time. The heat capacity of the burner was increased by from 25 per cent. to 40 per cent., and the starting period was reduced from 30 per cent. to 50 per cent. Carbonization, which had always increased with any increase in heating capacity, was reduced. The trouble from nonuniform oil conditions ceased; the market for the burner consequently extended; and the service problem was eliminated.

During the trial defendant's counsel admitted that the sheet metal heat-conducting cover plates used by the plaintiff are better than the cast-iron plates and that they perform the function better than cast iron. Consequently, the only question to be decided is whether any function of the sheet metal heat-conducting cover plate is unexpected and unobvious. That the invention seems simple after being made does not determine the question of invention, because the substitution of material may amount to invention if

some useful result or increase of efficiency is clearly obtained. There is no question in my mind that characteristic changes in results did occur when Neumann substituted his sheet metal cover plate for the cast-iron cover plate, and that the result was not obvious. As a matter of fact, it was unexpected because increasing heat would naturally increase carbonization, which is not the case in plaintiff's burner. Notwithstanding the fact that the heating effect of the Neumann burner is increased, carbonization is decreased. I conclude, therefore, that the case comes obviously under the doctrine laid down in many court decisions, such as United Shoe Machinery Corporation v. E. H. Ferree Co. et al. (C. C. A.) 64 F.(2d) 101, George Frost Co. et al. v. Cohn et al. (C. C. A.) 119 F. 505, 508, and others.

I reach this conclusion because I cannot find in the prior art, relied upon by the defendant, any burner that has the characteristics of plaintiff's burner. The patents relied upon by the defendant do not disclose the combination defined by claim 10 in suit herein, as their specifications do not refer to sheet metal heat-conducting cover plates, and the disclosures of their drawings are not sufficient to prove that the use of such a plate was ever contemplated by the respective patentees. I find that, while the different thicknesses of the cover plates of the prior patents may be ascertained by careful measurements of the drawings, it is an accidental showing only, and does not anticipate, because there is nothing in the specifications which recites or alludes to this feature. In view of the foregoing, I hold that claim 10 of the Neumann patent in suit is valid.

(G) *Dedication of the Claim to the Public.* The defense raised in connection with the Lapointe patent in suit with reference to the dedication of the claims therein in suit to the public is raised also in connection with the Neumann patent. Whatever has been said hereinabove with reference to the Lapointe patent applies equally to the Neumann patent.

(H) *Noninfringement.* Even a casual examination of defendant's burner leaves no question in my mind as to infringement thereby of claim 10 in suit herein. Defendant raises the point that the sole function of its cover plate is an adaptor to form a support for the inner combustion tube, and that this adaptor plate does not provide a fuel vaporizing space beneath it as called for by claim 10 of the patent in suit. I consider this mere quibbling, particularly in view of

the fact that it appears from the record that the International Oil Heating Company followed step by step the development of plaintiff's burner and made changes in its burner whenever plaintiff improved its burner. The International Oil Heating Company did so both as to the shape and the thickness of the sheet metal heat-conducting cover plate.

In view of the facts herein recited, I reach the conclusion that defendant's burner infringes claim 10 of the Neumann patent in suit.

█ For the foregoing reasons and conclusions, I hold that the defendant's burner infringes the claims relied upon by the plaintiff of the two patents in suit, and I do this without giving any weight to the commercial success of plaintiff's burner, because I have no doubt as to the validity of the patents and also the infringement. If I had any doubt on this score, I would resolve it in favor of the plaintiff because of the commercial success of its burner.

There may be a decree for the plaintiff in accordance with the prayer for relief, with costs to abide the event. Costs as to patent No. 1,377,669, to which the bill of complaint was dismissed, are awarded to the defendant.

Submit decree accordingly properly consented to as to form.